BLD-351                                                    NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4530
_____

HECTOR HUERTAS,
Appellant

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS; RICHARD A. HALL;
NANCY A. GIROUX; MICHAEL R. CLARK; CAPT. T. BALOS; M. OVERMYER; E. D.
RAY; CAPT. REPKO; RAYMOND J. SOBINA; MICHAEL C. BARONE

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 1:10-cv-00010)
District Judge: Honorable Sean J. McLaughlin

_____

Submitted for Possible Dismissal Pursuant to 28 U.S.C. § 1915(e)(2)(B)
or Summary Action Pursuant to Third Circuit LAR 27.4 and I.O.P. 10.6
July 25, 2013

Before:  HARDIMAN, GREENAWAY, JR. and SCIRICA, Circuit Judges

(Opinion filed:  August 9, 2013)
_____

OPINION
_____

PER CURIAM

Pro se Appellant Hector Huertas appeals the District Court's order granting

Defendants' motion for summary judgment and denying his cross-motion for summary

judgment.  For the reasons set forth below, will summarily affirm the District Court's

judgment.  See 3d Cir. L.A.R. 27.4; I.O.P. 10.6.

I.

Because we primarily write for the parties, we will recite only the facts necessary for our discussion.  Huertas is serving a life sentence for first degree murder and has been incarcerated in the custody of the Pennsylvania Department Corrections ("DOC") since July 26, 1999.  On October 28, 2002, Huertas and another inmate attempted to escape from SCI-Graterford.[1]  Since then, he has been confined continually at various Level 5 housing units, including the Restricted Housing Unit ("RHU") and Long Term Segregation Unit ("LTSU"), on either administrative custody or disciplinary custody status.[2]

The Magistrate's report and the District Court's opinion outlines in detail Huertas' history of confinement, including approximately 14 misconducts[3] and several transfers to

---

[1] As a result, Huertas received two misconducts for escape and possession of contraband, of which he was found guilty and sanctioned to 180 days of disciplinary custody.  He was also criminally charged for the escape attempt and pleaded guilty.

[2] Pursuant to DC-ADM 802 Policy and Procedures Manual, inmates may be placed on administrative custody status for a variety of reasons, including, but not limited to, being an escape risk.  Inmates are placed on disciplinary custody status if they are found guilty of a Class I misconduct.  See Exhibit A to Defendants' Concise Statement of Material Facts Not in Dispute.

[3] Several of the misconducts were for assaults.  In one instance, Huertas struck an officer repeatedly in the arm.  See Exhibit I to Defendants' Concise Statement of Material Facts Not in Dispute.  In another instance, Huertas spit in a corrections officer's face and kicked his leg.  See Exhibit J to Defendants' Concise Statement of Material Facts Not in Dispute.

various state correctional institutions.[4] Each transfer was a result of a misconduct. For instance, in July 2004, after the security department received credible information that Huertas was responsible for directing a "hit" on another inmate, who had been stabbed six times, Huertas was transferred from SCI-Greene to SCI-Frackville.

Huertas filed the complaint in this action in January 2010, alleging violations of his procedural due process and Eighth Amendment rights arising from his continued confinement in segregated housing at various state correctional institutions. The claims in this lawsuit concern the incarceration period beginning April 12, 2005, when Huertas was transferred to the LTSU at SCI-Fayette,[5] through July 7, 2009 when he was transferred from administrative custody at SCI-Albion to administrative custody in the RHU at SCI-Forest. See Exhibit C-3 to Concise Statement of Material Facts Not in Dispute at 19. The Defendants filed a motion for summary judgment and Huertas filed a cross-motion for summary judgment. Following a Magistrate Judge's recommendation to grant the defendants' motion and deny Huertes' motion, the District Court considered

---

[4] After the escape attempt, Huertas was transferred to SCI-Greene. Thereafter, he was transferred to SCI-Frackville, then to SCI-Smithfield, then to the Long Term Segregation Unit ("LTSU") at SCI-Lafayette, then to SCI-Albion, and finally to the RHU at SCI-Forest, where Heurtas remained in administrative custody at the time he filed this lawsuit in January 2010 and at the time of this appeal.

[5] This transfer occurred after Huertas received a misconduct and 90-days disciplinary custody for throwing an unknown liquid mixture through another inmate's food aperture, striking the inmate's leg. See Exhibit C-1 to Concise Statement of Material Facts Not in Dispute at 6.

Huertes' lengthy objections to the Magistrate Judges' report and followed the Magistrate Judge's recommendation. This appeal followed.

## II.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review of a district court's order granting or denying summary judgment, applying the same standard as the district court. See Tri–M Grp., LLC v. Sharp, 638 F.3d 406, 415 (3d Cir. 2011). We will affirm only if "drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Id. We may summarily affirm the district court's decision if the appeal presents no substantial question. See L.A.R. 27.4; I.O.P. 10.6.

## III.

The District Court did not err in granting defendants' motion for summary judgment on Huertas' due process claim. Procedural due process rights are triggered by deprivation of a legally cognizable liberty interest. For a prisoner, such a deprivation occurs when the prison "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). In determining whether a protected liberty interest exists, the court must consider: (1) the duration of the disciplinary confinement; and (2) whether the conditions of confinement were significantly more restrictive than those imposed upon other inmates in solitary confinement. See id. at 468; Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000).

4

We have previously held that eight years in administrative custody, where, for example, an inmate is confined to his cell for 23 hours each day, eats meals by himself, and is prohibited from participating in organizational activities, is atypical and implicates a protected liberty interest. Shoats, 213 F.3d at 144; cf. Smith v. Mensinger, 293 F.3d 641, 654 (3d Cir. 2002) (seven months in disciplinary confinement did not implicate a liberty interest); Torres v. Fauver, 292 F.3d 141, 151-52 (3d Cir. 2002) (disciplinary detention for fifteen days and administrative segregation for 120 days did not implicate a protected liberty interest). Accordingly, because of the length of time Huertas has spent in administrative custody, we hold that he has a protected liberty interest and is entitled to procedural due process. However, we conclude, as did the District Court, that Huertes has received the process to which he is entitled.

Administrative custody in the Pennsylvania state prison system "is used to assure a safe and secure environment for all inmates and staff by separating those inmates whose presence in the general population constitutes a threat to themselves, others, or the safety and security of the institution, or who represent an escape risk." Shoats, 213 F.3d at 142. There is no limit to the amount of time an inmate may be housed in administrative custody. Id. We have previously upheld the constitutionality of the DOC's policy statement 802, which sets forth the policies and procedures for confining inmates to administrative custody and the PRC's periodic review of their status. Id. at 145. In Shoats, we held that a prisoner who was placed in administrative confinement for eight years was afforded all the process he was due because an "'informal, nonadversary

5

review at which the prisoner has the opportunity to state his views satisfies the requirements of due process." Id. at 144 (quoting Hewitt v. Helms, 459 U.S. 460, 476 (1983)).

Here, Huertas has not argued that the DOC's policy statement 802 has been substantively amended since Shoats, or that the DOC failed to follow this policy. It is undisputed that Huertas' status was reviewed every ninety days in accordance with DOC policy. See Exhibit C to Concise Statement of Material Facts Not in Dispute. As the District Court pointed out, Huertas may disagree with prison officials' evaluation that ongoing administrative custody is justified by continuing security concerns, but he must show that the periodic reviews he receives are constitutionally inadequate, and he has not done so. Moreover, he can "conceivably be held in administrative custody merely because his prior crimes reasonably foreshadow future misconduct." Shoats, 213 F.3d at 146; see also Hewitt, 459 U.S. at 474; Fraise v. Terhune, 283 F.3d 506, 523 (3d Cir. 2002) ("[D]ue process is not violated by placing an inmate in administrative custody based on past conduct that furnishes a basis for predicting that the inmate will engage in future acts of violence if corrective measures are not taken.").[6]

We have carefully reviewed the motions and the evidence, and conclude that there

---

[6] To the extent that Huertas' due process claim is based on his placement on the Restricted Release List ("RRL"), a list of inmates who may only be released from administrative custody upon prior approval of the Secretary of Corrections, we agree with the District Court that this does not implicate a constitutionally protected due process right.

6

is no arguable basis in fact or law for disagreeing with the District Court's summary judgment determination regarding Huertas' due process claim.

IV.

Heurtas alleges that the 24-hour lighting in the RHU violates the Eighth Amendment prohibition against cruel and unusual punishment.  Summary judgment in favor of the Defendants was proper in this instance.  The Eighth Amendment protects prison inmates from cruel and unusual punishment.  See, e.g., Farmer v. Brennan, 511 U.S. 825, 832 (1994).  However, not all deficiencies and inadequacies in prison conditions amount to a violation of a prisoner's constitutional rights.  Rhodes v. Chapman, 452 U.S. 337, 349 (1981).  To assert an Eighth Amendment conditions of confinement claim, a prisoner must satisfy both an objective and subjective test.  See Wilson v. Seiter, 501 U.S. 294, 298 (1991).  Specifically, a prisoner must show that the alleged deprivation is "sufficiently serious" such that he has been deprived of the "minimal civilized measure of life's necessities."  Farmer, 511 U.S. at 834.  A prisoner must also demonstrate that prison officials possessed a "sufficiently culpable state of mind" of "deliberate indifference" to his health or safety.  Id.  Only "extreme deprivations" are sufficient to present a claim for unconstitutional conditions of confinement.  Hudson v. McMillian, 503 U.S.1, 8-9 (1992).

Continuous lighting has been held to be permissible and reasonable in the face of legitimate penological justifications, like the need for security and the need to monitor prisoners.  See O'Donnell v. Thomas, 826 F.2d 788, 790 (8th Cir. 1987); see generally

7

<u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987).  Here, Defendant Beard explained that the constant illumination is required for security purposes so that staff can better monitor inmates who may present a risk of harm to themselves or others, or inmates, like Huertas, who attempt to escape.  <u>See</u> Exhibit B to Defendants' Concise Statement of Material Facts Not in Dispute.  Huertas has not shown that the lights were kept on for any impermissible purpose and, thus, the constant illumination does not rise to the level of cruel and unusual punishment.[7]  Overall, the record shows that the prison complied with constitutional standards at the most basic level, and Huertas does not provide any evidence from which a reasonable jury could conclude that he was deprived of the "minimal civilized measure of life's necessities," <u>Farmer</u>, 511 U.S. at 834, or that his health and safety were at risk, <u>see</u> <u>Hassine v. Jeffes</u>, 846 F.2d 169, 174-75 (3d Cir. 1988).

IV.

For the foregoing reasons, no substantial question is presented and we will affirm the judgment of the District Court.  <u>See</u> 3d Cir. L.A.R 27.4; I.O.P. 10.6.

---

[7] In some instances where continuous lighting causes inmates to suffer physical and psychological harm, courts have held that living in constant illumination is without penological justification.  <u>See, e.g.</u>, <u>Keenan v. Hall</u>, 83 F.3d 1083, 1090-91 (9th Cir. 1996) (considering a claim from a prisoner who suffered grave sleeping and other problems because of large florescent lights directly in front of and behind his cell that constantly illuminated his cell 24 hours a day in such a way that he could not distinguish day from night).  However, here, Huertas has not provided competent medical evidence to show that he suffered serious psychological harm and eye problems because of the lighting in the RHU.